IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

   Plaintiff,

v.

REVEN HOLDINGS, INC. d/b/a REVEN
PHARMACEUTICALS, REVEN
PHARMACEUTICALS, INC., BRIAN D.
DENOMME, PETER B. LANGE, and MICHAEL A.
VOLK,

   Defendants,

and

REVEN, LLC, REVEN IP HOLDCO, LLC, REVEN
ONCOLOGY LICENSING, LLC, and HEALTH
ANALYTICS & RESEARCH SERVICES, LLC,

   Relief Defendants.

---

**<u>FILED UNDER SEAL</u>**

**COMPLAINT AND JURY DEMAND**

---

   Plaintiff, United States Securities and Exchange Commission ("SEC" or "Commission"),

alleges as follows against Defendants Reven Holdings, Inc. d/b/a Reven Pharmaceuticals

("Reven"), Reven Pharmaceuticals, Inc. ("Reven Pharmaceuticals"), Brian D. Denomme, Peter

B. Lange, and Michael A. Volk (Denomme, Lange, and Volk, collectively "Reven Principals")

(collectively, "Defendants") and Relief Defendants Reven, LLC ("Reven LLC"), Reven IP

Holdco LLC ("Reven IP"), Reven Oncology Licensing, LLC ("Reven Oncology"), and Health

Analytics & Research Services, LLC ("Health Analytics") (collectively, "Relief Defendants").

## INTRODUCTION

1.      The SEC brings this emergency enforcement action to stop an ongoing offering

fraud and misappropriation of investor assets by Defendants. In or around January 2019 and

continuing through the present (the "Relevant Period"), Reven, a start-up biotechnology and

pharmaceutical company, and the Reven Principals raised at least $44 million from

approximately 175 investors to develop a drug called Rejuveinix ("RJX"). During the Relevant

Period, Defendants misappropriated at least $8.8 million in investor funds.

2.      Defendants misappropriated investor money through a variety of means, including

by funneling investor funds from Reven's and Reven Pharmaceuticals' bank accounts through a

shell company, Health Analytics, that the Reven Principals jointly owned, and into the Reven

Principals' personal bank accounts. At times, the Reven Principals also used misappropriated

investor funds to buy expensive jewelry and to pay various personal expenses, including

mortgages, credit cards, travel for themselves and their family members, and Tesla and Mercedes

car leases.

3.       During the Relevant Period, Defendants also made numerous false and

misleading statements in connection with the offer and sale of securities to investors, including

representations about the amount of compensation they earned (they took millions of dollars of

investor funds in addition to the compensation they disclosed), that Reven had or would soon

have audited financial statements (it did not and could not given that no auditors had even been

retained), that Reven would soon launch a public offering (similarly, it could not because it

needed audited financials, among other things, to do so), the specific use of investors' funds to be used for clinical drug trials or to complete its public offering (it instead used funds to pay off pending litigation and to pay other third parties), and that there was no litigation (in fact, Reven and some of its principals had been sued for conduct giving rise to securities fraud).

4.    Defendants' fraudulent and deceptive conduct continued even after the SEC staff contacted them in early November 2021. Defendants misappropriated investor funds at least through the end of 2021. And, as recently as October 2022, Defendants have solicited money from investors while continuing to make false and misleading statements related to whether other investors were actually investing millions of dollars (none had or committed to), and threatening investors that if they do not invest, Defendants will sell Reven's intellectual property ("IP") (*e.g.*, patents relating to RJX) for pennies.

5.    By engaging in this conduct, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Unless restrained and enjoined, Defendants will continue to violate the federal securities laws.

6.    Relief Defendant Health Analytics received illicit proceeds from the Defendants' fraud to which it has no legitimate claim and under circumstances in which it is not just, equitable, or conscionable for it to retain the funds. Reven LLC, Reven IP, and Reven Oncology are the owners of intellectual property, which has been obtained, maintained, expanded, or exploited with proceeds of Defendants' fraud and, prior to and continuing through the Relevant Period, the IP was transferred to these Relief Defendants for no consideration.

## DEFENDANTS

7.      **Reven Holdings, Inc.** ("Reven") is a Delaware corporation with its principal

place of business in Westminster, Colorado. Reven was formed in August 2018 as a privately

held biotechnology and pharmaceutical holding company with the purpose of acquiring and

commercializing pharmaceutical assets in various stages of clinical development, including a

cardiovascular intravenous drug treatment call RJX, which is a purported treatment for critical

limb ischemia, sepsis, cancer, viral illnesses, and COVID-19. Reven does business as "Reven

Pharmaceuticals." Denomme, Lange, and Volk are its sole acting directors, are the most senior

officers of the company, collectively are the majority owners of Reven's stock, and are

signatories on and control Reven's bank accounts.

8.      **Reven Pharmaceuticals, Inc.** was a Florida corporation formed in October 1999,

located in Golden, Colorado. On August 21, 2018, pursuant to an Asset Contribution Agreement

and Plan of Reorganization, Reven Pharmaceuticals transferred its assets and liabilities to

Reven's wholly owned subsidiary relief defendant Reven, LLC, and Reven Pharmaceuticals

shareholders became proportionate shareholders of Reven. In September 2019, Reven

Pharmaceuticals was administratively dissolved as a Florida corporation, but presently maintains

an active bank account where investor funds are deposited and proceeds are disbursed. Reven

does business as Reven Pharmaceuticals, and the Defendants use the names Reven and Reven

Pharmaceuticals interchangeably. The Reven Principals are signatories on and control Reven

Pharmaceuticals' bank accounts.

9.      **Brian Denomme**, age 59, is a resident of Northville, Michigan. Denomme is a

Reven co-founder, a member of Reven's board, and Reven's president. He was formerly Reven's

4

chief operating officer ("COO"). He owns approximately 17% of Reven's shares, as of July 6, 2020, and collectively with Lange and Volk controls the majority of Reven stock.

10.     **Peter B. Lange**, age 64, is a resident of San Antonio, Texas. Lange is a Reven co-founder, a member of Reven's board, and Reven's chief executive officer ("CEO"). Lange is a dual United States and Swiss citizen. He owns approximately 18% of Reven's shares, as of July 6, 2020, and collectively with Denomme and Volk controls the majority of Reven stock.

11.     **Michael Volk**, age 54, is a resident of Broomfield, Colorado. Volk is a Reven co-founder, a member of Reven's board, and Reven's chief strategy officer ("CSO"). Until April 2020, Volk was Reven's chief financial officer ("CFO"), when Reven hired a contract CFO. When that CFO resigned in or around August 2022, Volk again took over the role. He owns approximately 16% of Reven's shares, as of July 6, 2020, and collectively with Denomme and Lange controls the majority of Reven shares.

## RELIEF DEFENDANTS

12.     **Reven, LLC**, a Delaware limited liability company formed in August 2018, with its principal place of business in Westminster, Colorado, is a wholly owned subsidiary of Reven. In its offering materials, Reven describes Reven, LLC as its operating company. In August 2018, Reven Pharmaceuticals transferred its assets, including its intellectual property ("IP"), to Reven, LLC. At that time, Reven, LLC owned and controlled the IP relating to RJX.

13.     **Reven IP Holdco LLC**, a Delaware limited liability company formed in June 2020, with its principal place of business in Westminster, Colorado, is a subsidiary of Reven. Reven LLC transferred some or all of its IP assets, including some or all of the IP relating to RJX, to Reven IP in 2020.

14.     **Reven Oncology Licensing, LLC** is a Delaware limited liability company formed in November 2018, with an address in Golden, Colorado. A license agreement between Reven Oncology Licensing and a third party states that Reven Oncology owns or otherwise controls certain IP relating to RJX.

15.     **Health Analytics & Research Services LLC**, a Colorado limited liability company formed in September 2017, with an address in Broomfield, Colorado, is a shell company owned by the Reven Principals and is principally controlled by Volk.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a).

17.     The Court has personal jurisdiction over Defendants and Relief Defendants, and venue is proper in the District of Colorado pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because many of the acts and transactions constituting violations of the Securities Act and Exchange Act occurred in this district, including misappropriation and misuse of investor funds through transactions at banks located in this district. In addition, Volk resides in this district, and the Reven entities have their principal places of business in this district, and one or more investors in Reven Holdings reside in this district.

18.     In connection with the conduct alleged in this Complaint, Defendants and Relief Defendants, directly or indirectly, singly or in concert with others, made use of the means or

instrumentalities of interstate commerce, the means and instruments of transportation or

communication in interstate commerce, or the mails, including obtaining funds from investors

through wire transfers in interstate commerce.

**FACTS**

**I.      BACKGROUND**

      **A.      The Formation of Reven and the Reven Principals' Control of Reven and Reven Pharmaceuticals**

            **1.      The Formation of Reven**

19.     Reven's corporate history extends back to at least 1999 and includes two different

name changes before the name was changed to Reven Pharmaceuticals in 2009. Between 2013

and 2015, Reven Pharmaceuticals filed numerous SEC Form D Notices of Exempt Offerings of

Securities for various of its securities offerings. Reven has operated as Reven Pharmaceuticals

from 2009 until the present.

20.     In August 2018, Reven was formed as a Delaware Corporation through a

reorganization of Reven Pharmaceuticals in which its shareholders became the same

proportionate shareholders in Reven. Reven is a successor corporation to Reven

Pharmaceuticals, but continues to do business as Reven Pharmaceuticals.

21.     Reven Pharmaceuticals was administratively dissolved as a Florida corporation in

September 2019.

22.     During the Relevant Period, investor funds were deposited in two bank accounts;

one in the name of Reven, and one in the name of Reven Pharmaceuticals. The majority of

disbursements to the Reven Principals were made from the bank account in the name of Reven

Pharmaceuticals.

7

## 2. The Reven Principals Owned and Controlled Reven and Reven Pharmaceuticals

23.     The Reven Principals, as co-founders, the most senior executive officers, directors, signatories with authority over Reven's and Reven Pharmaceuticals' bank accounts, and, collectively, as majority shareholders of Reven, exercised control over the management, general operations, and policies of Reven and Reven Pharmaceuticals, as well as the specific activities upon which their violations are based.

24.     Throughout the Relevant Period the Reven Principals held director, senior executive officer, and majority owner positions in Reven and Reven Pharmaceuticals: Denomme as a co-founder, director, and COO or President of Reven; Lange as a co-founder, director, and CEO of Reven; Volk as a co-founder, director, and CFO or Chief Strategy Officer, Treasurer, and Secretary of Reven.

25.     Denomme, Lange, and Volk wanted to own at least 51% of Reven's shares in order to control Reven and took steps to ensure that they, collectively, had enough shares to be majority owners, such as, for example, issuing themselves shares in lieu of compensation.

26.     As of August 17, 2018, out of 392,431,372 total Reven shares issued and outstanding, Denomme owned 80,186,181 shares, Lange owned 84,861,290 shares, and Volk owned 76,952,529 shares. Thus, as of August 17, 2018, the Reven Principals owned, collectively, 242,000,000 shares of Reven stock, or 62% of Reven's outstanding shares.

27.     As of July 6, 2020, Denomme, Lange, and Volk owned the same amount of shares as detailed in the previous paragraph, but Reven had increased its outstanding stock to 470,766,654 shares. Thus, as of July 6, 2020, the Reven Principals owned, collectively, 242,000,000 shares of Reven stock, or 51% of Reven's outstanding shares.

28.     Reven's Bylaws state that board resolutions pass with a majority of the authorized
directors, and that a majority vote of the shares present at any stockholders meeting constitutes
an act of the stockholders.

29.     Each of the Reven Principals is a signatory on and has authority over the Reven
and Reven Pharmaceuticals bank accounts into which investor funds were paid and
disbursements were made.

30.     The Reven Principals had the power to act and did act on behalf of Reven and
Reven Pharmaceuticals, and thus their actions alleged herein as well as their states of mind are
imputed to Reven and Reven Pharmaceuticals.

**B.     Defendants Raised Money From Investors Through the Sale of Reven
Securities.**

31.     On September 18, 2018, Reven filed an SEC Form D, Notice of Exempt Offering
of Securities, for a total offering amount of $350 million.

32.     Thereafter, Reven raised at least $44 million from approximately 175 investors
through the sale of Reven securities, including common stock and notes convertible to common
stock. Reven continues to offer securities to investors and has done so as recently as October
2022.

33.     During the Relevant Period, Defendants solicited investors by distributing Reven
offering documents to investors and prospective investors by email and otherwise. The Reven
offering materials included, among other things, private placement memorandums ("PPMs"),
subscription agreements ("Subscription Agreement"), investor slide deck or presentations
("Investor Decks"), flyers, presentations, other information about RJX, and wire instructions
(collectively, the "Offering Documents").

34.     The typical process for an investor to buy common stock in Reven included

Defendants distributing to all investors, via email and otherwise, Reven's August 31, 2018 PPM,

July 6, 2020 PPM, and/or January 1, 2021 PPM, Subscription Agreements that incorporated by

reference the applicable PPM, and wire instructions. Volk signed all the Subscription

Agreements as Reven's CFO.

35.     The wire instructions instructed investors to wire their money to Reven's Wells

Fargo checking account. Defendants then typically transferred investor money to Reven

Pharmaceuticals' bank account from which disbursements were made.

36.     The PPMs were substantially similar and included information about Reven's

business, terms of the offering, RJX, its IP and patents, use of proceeds, management, executive

compensation, and litigation involving the company and its directors and officers.

37.     By way of examples, on September 9, 2019, Lange emailed Investor 1 the 2018

PPM. On July 8, 2020, Lange, copying Volk, emailed Investor 1 the 2020 PPM. Volk or Lange

also provided Investor 1 with Subscription Agreements incorporating each PPM, which she

signed and sent back to Defendants. On September 14, 2021, Volk sent Investor 2 wire

instructions and a Subscription Agreement to complete.

38.     Defendants also held formal and informal meetings to solicit investors at hotels,

homes, and restaurants. These meetings took place in multiple locations across the country,

including in Florida, Michigan, and Colorado, during the Relevant Period.

C.    **Defendants are the Makers of Statements in the Offering Documents, Oral Representations, and Emails.**

39.    The statements in the Offering Documents were made by the Defendants as those documents are attributed specifically to Reven, Reven Pharmaceuticals, and their management, and the Reven Principals had ultimate authority over the content.

40.    Given that each of the Reven Principals' shares were necessary to maintain majority control, the approval of each was necessary. And the Reven Principals reviewed and approved the Offering Documents.

41.    Each of the Reven Principals reviewed, discussed, provided input, and approved the PPMs and Investor Decks.

42.    The 2018 PPM lists Reven Pharmaceuticals as the company contact. The 2018 PPM directs requests for additional information to Volk. The 2020 and 2021 PPMs direct requests for additional information to Lange.

43.    Volk signed the Subscription Agreements as Reven's CFO.

44.    Defendants were also the makers of representations in oral conversations with and in emails to investors.

II.    **DEFENDANTS MISAPPROPRIATED OVER $8.8 MILLION OF INVESTOR MONEY.**

45.    Instead of using investor money for the purposes disclosed in the Offering Documents, Defendants, using their control over Reven's and Reven's Pharmaceuticals' bank accounts, misappropriated at least $8.8 million of investor funds through a variety of means, including making payments unrelated to the business directly to the Reven Principals' personal bank accounts, paying personal credit cards, making payments to individuals or entities for the

benefit of the Reven Principals, and transferring over $1.8 million to the shell company, Health Analytics, from which the Reven Principals received additional payments directly or for their benefit. As detailed below, Defendants disclosed that the Reven Principals would receive certain compensation for their work at Reven.  The Reven Principals, misappropriated $8.8 million beyond the compensation disclosed to Reven investors.

46.    The Wire Instructions directed investors to make investments in Reven by wiring money to Reven's bank account (though a de minimis amount of investor money was also sent directly to Reven Pharmaceuticals' bank account). These accounts received over $44 million from investors.

III.    **DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN CONNECTION WITH THE SECURITIES OFFERED AND SOLD TO INVESTORS.**

47.    In the Offering Documents and emails to and conversations with investors and prospective investors, Defendants made numerous materially false and misleading statements and omissions regarding, among other things, the Reven Principals' compensation, an audit of Reven's financial statements, Reven's purported public offering, specific use of investor funds, and litigation involving the Defendants.

A.    **Defendants Made Materially False and Misleading Statements and Omissions About the Reven Principals' Compensation.**

48.    Throughout the Relevant Period, in the PPMs sent to investors and prospective investors, Defendants made materially false and misleading statements and omissions about the Reven Principals' compensation. For 2019, 2020, and 2021, Defendants purportedly disclosed their annual compensation from Reven, but for each of those years they personally took far more investor money than what was disclosed in Reven's PPMs to investors.

      **1.**    **For 2019, Defendants Disclosed the Reven Principals' Compensation, Collectively, as Between $1.6 Million to $2.3 Million and They Took, Collectively, $5.3 Million.**

49.    The August 31, 2018 PPM "Use of Proceeds" section disclosed that general administrative and payroll ("G&A") expenses for 2019, which included payroll for all Reven employees, including the Reven Principals, rent, and other expenses, was expected to be $5 million. Reven's 2019 bank records show approximately $2.7 million in payroll costs for employees other than the Reven Principals and rent for Reven's offices.  As a result, to be consistent with the 2018 PPM, the Reven Principals' compensation could be no more than $2.3 million.

50.    The July 6, 2020 PPM was even more specific about 2019 compensation for the Reven Principals. That PPM included a new section entitled "Executive Compensation," which disclosed specific salary amounts for the Reven Principals of $540,000 each for 2019, which, collectively totals $1.62 million.

      **2.**    **For 2020, Defendants Disclosed the Reven Principals' Compensation, Collectively, as $2 Million, and They Took, Collectively, $3.35 Million.**

51.    Reven's 2020 PPM represented in the "Executive Compensation" section that the Reven Principals' 2020 salary and total compensation was $660,000 each, for a total, collectively, of $1.98 million.

      **3.**    **For 2021, Defendants Disclosed the Reven Principals' Compensation, Collectively, as $2.16 Million, and They Took, Collectively, $6.65 Million.**

52.    The January 1, 2021 PPM also included an "Executive Compensation" section that disclosed the Reven Principals' salary and total compensation of $720,000 each for 2021, for a collective total of $2.16 million.

### 4.    The Statements Were False and Misleading, Made With Scienter, and Material.

53.    A reasonable investor would have understood from these statements that the Reven Principals' total compensation would be $1.62 million in 2019, $1.98 million in 2020, and $2.16 million in 2021.

54.    These statements regarding the compensation of the Reven Principals were false and misleading because the Reven Principals took far in excess of the amounts appearing in the PPMs.

  a. In 2019, the Reven Principals took, collectively, $5,351,716: Denomme $909,049; Lange $1,575,860; and Volk $2,866,807. Thus, using either the $1.6 million or $2.3 million disclosed amounts, Defendants misappropriated at a minimum $3 million of investor money.

  b. In 2020, the Reven Principals took, collectively, $3,356,573: Denomme $753,408; Lange $221,333; and Volk $2,381,832. Thus, Defendants misappropriated at least $1.4 million of investor money.

  c. In 2021, the Reven Principals took, collectively, $6,648,490: Denomme $909,049; Lange $2,078,036; Volk $3,133,502. Thus, Defendants misappropriated at least $4.4 million of investor money.

55.    The chart below shows the Reven Principals' disclosed compensation and amounts they misappropriated for the Relevant Period:



56.     Each of these statements regarding the Reven Principals' compensation was false and misleading when made, and Defendants knew or were reckless in not knowing, and should have known, that these statements were false and misleading. Defendants misappropriated investor funds to pay for personal expenses unrelated to the business as described above and were aware of the payments they received.

57.     The above false and misleading statements and omissions as to the Reven Principals' compensation were material to investors. A reasonable investor would want to know the true use of his or her funds. Moreover, the Reven Principals misappropriated at least $8.8 million, which is approximately 20% of the total amount raised from investors during the Relevant Period.

**B.     Defendants Made Materially False and Misleading Statements Regarding a Purported Audit of Reven's Financial Statements.**

58.     During the Relevant Period, Defendants represented to investors in emails and Investor Decks that Reven either (a) would imminently have two years of audited financial

statements (one of the requirements for a public offering) or (b) that Reven *did* have two years of audited financial statements.

59.    The false and misleading statements made by the Defendants in the Investor Decks and emails include the following:

a.    In a September 9, 2019 email to Investor 1, Lange attached an August 2019 Reven Investor Deck stating that Reven "will have the minimum required two years of audited financial statements ending September 30, 2020 making it eligible to offer its shares for sale in an Initial Public Offering as early as October 2020."

b.    In a December 9, 2019 email to investors, Volk, copying Lange and Denomme, represented to investors that: "We are working directly with a very reputable firm for SEC compliance in preparation for an IPO to hopefully happen sometime during 2020—it will NOT be prior to October since we need a minimum of 2 years audited financials which will be at the end of September 2020 due to restructure that we did last year. *We are currently undergoing our first audit now.*" (Emphasis added.)

c.    In an April 20, 2020 email to multiple investors, Volk, copying Denomme, attached an Investor Deck stating that the company "will have the minimum required two years of audited financial statements ending September 30, 2020 making it eligible to offer its shares for sale in an Initial Public Offering as early as October 2020."

d.  In a July 8, 2020 email to Investor 1, Lange, copying Volk, told Investor 1 that "[o]ur audit should be completed in mid-September early October which will allow us to file our S1 sometime before the end of the year and taking next steps towards and IPO in 2021."

e.  In an April 6, 2021 email to certain investors, Volk attached a December 2020 Reven Investor Deck stating that Reven was working to "[o]rganize and execute an initial public offering (IPO) [in] early 2021" and that the company "will have the required minimum two years of audited financial statements ending 2020."

f.  In an August 26, 2021 email to Investor 2, Volk, copying Lange, attached an August 2021 Reven Investor Deck stating that Reven was working to "[o]rganize and execute an [sic] public offering late in 2021," and that the company "will have the required minimum two years of audited financial statements ending August 2021."

g.  In a December 6, 2021 email to investors, Volk, copying Lange, attached a December 2021 Reven Investor Deck stating, in the section titled, "Strategic Paths Forward," and "Going Public," that the "Company *has* the minimum required two years of audited financial statements ending August 2021." (Emphasis added).

h.  In a December 16, 2021 email to Investor 1, Lange, copying Volk, told Investor 1 that he was sending her "the new deck we are starting to send out to institutions we are speaking to." The attached Investor Deck stated, in the section titled "Strategic Paths Forward" and "Going Public," that the "Company *has* the

minimum required two years of audited financial statements ending August

2021." (Emphasis added).

      i.   In a September 14, 2022 email to Investor 1, Lange, copying Volk, attached an

Investor Deck stating in the section titled, "Strategic Paths Forward" and "Going

Public," that the "Company *has* the minimum required two years of audited

financial statements ending August 2021." (Emphasis added).

60.    A reasonable investor would have understood from the statements referenced

above that Reven had bookkeeping records capable of being audited, that Reven would retain or

had retained audit firms to audit its financial statements, and, as to the representations that Reven

*had* two years of audited financial statements, that an audit firm would have been retained,

started and completed an audit.

61.    These representations about imminently having, or in fact having, audited

financial statements, or suggesting that Reven would soon "go public," were false and

misleading. In reality, during the Relevant Period:

      a.   No audit of Reven's financial statements was ever started, let alone completed.

      b.   Reven never retained any accounting or auditing firm to perform an audit of

Reven's financial statements; and

      c.   Reven never had complete and reconciled accounting and bookkeeping records

necessary to generate financial statements capable of being audited.

62.    Each of the above statements regarding audited financial statements were false

when made, and Defendants knew or were reckless in not knowing, and should have known, that

their statements were false and misleading. Each of the Reven Principals were senior officers of

the company and knew the status of any audit because of weekly update conference calls with

the then-CFO.

63.     On weekly conference calls with the Reven Principals from approximately spring

of 2021 until early fall of 2021, Reven's former contract CFO repeatedly told each of the Reven

Principals that Reven needed to properly reconcile its financials in order to prepare tax returns

and that Reven's financial statements could not be audited and that Reven could not go public

until its financial records were reconciled.

64.     The above misrepresentations regarding the imminent or completed audit of

Reven's financial statements were material to investors and potential investors because a

reasonable investor would want to know whether Reven's financial statements were audited

when assessing the reliability of representations regarding Reven's financial condition and

performance and its ability to have a public offering.

**C.     Defendants Made Materially False and Misleading Statements Regarding
Reven's Purported Direct Public Offering.**

65.     A direct public offering ("DPO"), or direct listing, is where a company offers its

securities on a stock exchange, like NYSE or NASDAQ, directly to the public, without financial

intermediaries, such as investment banks and underwriters, in order to have lower transaction

costs as compared to an initial public offering or IPO.

66.     A DPO required Reven to: have at least two years of audited financial statements;

prepare and file an S-1 registration statement with the SEC (which requires audited financial

statements); meet the stock exchanges' listing rules, including meeting certain financial metrics

such as pre-tax income targets for a certain historical period or meeting certain market

capitalization targets; and obtain a recent valuation from an independent third party indicating at

least $250 million in aggregate market value of publicly held shares (*i.e.*, held by persons other than directors, officers, and presumed affiliates).

67.     In the summer of 2021, Defendants represented to investors that Reven was preparing for a DPO of its stock on a major stock exchange, such as NYSE or NASDAQ, by at least October 2021.

68.     Defendants made representations to induce investors to invest in Reven before a purported DPO occurred. These statements include:

a.     On July 14, 2021, Defendants sent Investor 1 a document entitled "Reven Holdings Pre-Direct Public Offering Brief and Deal Structure." In that document, Defendants represented that:

Reven is currently preparing for a Direct Public Offering of their stock on a major stock exchange to occur September/October 2021. The company intends on filing its S-1 registration statement as early as August as a required final step outlining the specific details of the offering as well as competing [sic] formal registration of the company's authorized and issued capital. *Reven has completed all of the necessary groundwork to accomplish a listing and public offering of its shares with the exception of the completion of its financial audit.* The company intends on selling 5,000,000 newly issued shares in the direct public offering priced at $5.00/share to raise $25 Million for the continued support of its clinical development program. Prior to the offering, Reven is seeking to raise an additional $7.5 million *to complete the current in-process trials and provide the required financial support to complete the public offering.*

This pre-public offering is being presented to existing shareholders as a final opportunity to purchase shares prior to the company being listed on a public exchange. There is no obligation for any shareholder to participate in this offering, and everyone will be able to acquire additional shares once the listing is completed and the shares are freely trading on the exchange of choice at whatever the market price may be at the time.

**Number of Pre-Listing Shares being Issued:** 7,500,000
**Class of Shares:** Common stock (ALL authorized and issued Reven shares are common)
**Pre-Listing Price Per Share for this Offering:** $1.00

20

**Anticipated Listing Price:** $5.00 - $7.00
**Anticipated Exchange:** NYSE or NASDAQ - NYSE is the exchange of choice
for DPO

(Italic emphasis added).

    b.   On June 9, 2021, Investor 3 received an email written by Lange, on which Volk

was copied, that made many of the same representations, including:

Our timeline is to launch the DPO in September when everyone is heading back
to work. . . . Its [sic] important to know that our S1 is essentially already finished
which requires our audit to be completed which should be finished in the next 45-
60 days. Our projection is July 15th but with summer holidays I really think we
will not hit that date.

Here is an update with respect to our pursuit of a public listing subsequent to the
completion and filing of our S-1 registration statement being filed with the SEC
within the next 3 – 5 weeks.

    c.   On August 26, 2021, Investor 2 received an email form Volk, copying Lange,

soliciting him to invest in the pre-DPO offering, representing that he could invest

for $2.50 a share, and that the "desired opening price is anticipated to be around

the $5.00 to $7.00 dollar per share range."

    d.   On September 14, 2021, in a phone conversation with Volk, Volk represented to

Investor 2 that Reven's DPO was "inevitable" and would be completed in the next

few months. In the same conversation, Volk also told Investor 2 that Reven would

use this pre-public offering cash infusion to complete phase II drug trials, do more

phase II drug trials, and to complete the necessary steps to have a DPO. Volk

eventually offered to sell Investor 2 pre-DPO Reven shares at $1.00 per share.

    69.   Based on these representations, Investor 1 wired $2 million on or around July 16,

2021, and another $3 million on or around August 27, 2021 to Reven's bank account to buy

additional shares of Reven stock. Investor 2 wired $2.5 million to Reven's bank account on

September 15, 2021 to buy shares of Reven Stock.

70.     A reasonable investor would have understood from the representations referenced

above that, with the exception of completing an audit of its financial statements, Reven had

completed all steps necessary to file an S-1 registration statement, that a complete audit of its

financial statements was imminent, and that Reven would have satisfied all the requirements to

list its stock through a DPO on the NYSE or NASDAQ in the next one to three months.

71.     These statements in paragraphs 68.a-d were false and misleading because Reven

was not able to launch a DPO in September or October 2021 because it failed to complete the

necessary steps and was not in a position to take the necessary steps because it had not engaged

an audit firm, and its books and records were not auditable.

72.     As noted above, Reven needed to file a Form S-1 with the SEC to do a DPO.

However, Reven had not submitted an S-1 registration statement to the SEC at the time the

statements were made. At no time during the Relevant Period did Reven file an S-1 with the

SEC. Additionally, certain steps needed to take place prior to Reven filing a Form S-1, and

contrary to Reven's representations, none of these steps occurred, including: having audited

financial statements, books and records capable of being audited, hiring an audit firm, and

completing the audit.

73.     Defendants omitted to state material facts that were necessary to render their

statements that they intended to launch a DPO in September or October 2021 not misleading.

These omissions included that Reven could not have launched a DPO because its books and

records were so incomplete that it could not be audited, and that would prevent it from filing a

Form S-1 as required for a DPO.

74.    Each of the above representations regarding a DPO were false or misleading when

made, and Defendants knew or were reckless in not knowing, and should have known, that their

statements were false and misleading. The Reven Principals knew that there was not going to be

an audit or that an S-1 filing was not imminent because they had not engaged an audit firm and

Reven's CFO had been telling each of the Reven Principals in their weekly conference calls the

same since the spring of 2021.

75.    The above misrepresentations regarding the steps taken necessary to do a DPO

and that a DPO was imminent were material to investors and potential investors because a

reasonable investor would understand that Reven's failure to launch a DPO would diminish the

value of their investment.

**D.    Defendants Made Other Materially False and Misleading Statements to
Investors About the Specific Use of Their Funds.**

**1.    Defendants Made False and Misleading Statements to Investor 1
About How Her 2019 Investment Would be Used.**

76.    At a meeting on September 16, 2019, Investor 1 discussed with Volk and Lange

how her first $2 million investment in September 2019 would be used. In response, Lange,

copying Volk and Denomme, emailed Investor 1 on September 17, 2019, with the subject line,

"Use of your investment," representing that, among other things, $50,000 would be paid to each

of the Reven Principals, for a total of $150,000.

77.    Instead, from Investor 1's $2 million 2019 investment, Denomme received

$98,396; Lange received $290,000; and Volk received $248,714, or collectively 31% of Investor

1's investment. At the time Investor 1 transferred her investment funds, the bank accounts where the funds were wired had a balance of only $24,912, with no other substantial investor deposits between the time of Investor 1's deposit, and disbursements to the Reven Principals.

> **2.    Defendants Made False and Misleading Statements to Investor 1 and Investor 2 Regarding How Their 2021 Investments Would Be Used.**

78.    Defendants Volk and Lange made false and misleading statements to Investor 1 and Investor 2 that their investments in August and September of 2021, respectively, would be used only to complete clinical trials, start new ones, and to pay for completing the steps necessary to list in a DPO.

79.    Reven used some of  Investor 1's $3 million August 27, 2021 investment or Investor 2's $2.5 million September 15, 2021 investment, or some of both, to make an initial $1.5 million payment toward an oncology intellectual property license transaction with a company owned by Reven's then-chief-medical officer and to pay at least $2 million to settle an undisclosed five-year-old Reven shareholder securities fraud lawsuit (the "Shareholder Lawsuit"), in which the plaintiff, a Reven shareholder, had alleged that Reven, Reven Pharmaceuticals, Reven, LLC Lange and Volk had committed fraud and securities fraud. The previous balances in the bank accounts were not sufficient to cover these payments and no other substantial investor deposits were made during this time frame that could have covered these payments.

> **3.    Defendants Made False and Misleading Statements as to How Investor 3's 2021 Investment Would Be Used.**

80.    On September 1, 2021, in a phone conversation between Lange and Investor 3, Lange made false and misleading statements to Investor 3 that her September 2021 investment

would be used towards the payment of the above-mentioned licensing agreement with Reven's

then-chief-medical officer's company to license its oncology intellectual property. That same

day, Lange, copying Volk and Denomme, emailed Investor 3 and some of her family members

the same information.

81.    On September 8, 2021, Investor 3 spoke with Lange on the phone about the

proposed investment. Lange then sent Investor 3 a follow up email explaining how Reven would

use the acquired oncology intellectual property.

82.    On September 10, 2021, Investor 3 and some of her family members had a

conference call to understand the licensing transaction and how investing in Reven would help

fund the acquisition.

83.    Based on these representations, Investor 3 invested $500,000 on September 24,

2021, and two of her family members invested an additional $500,000 each.

84.    Instead of using the investment money to obtain the licensing agreement, Reven

used a portion to make an additional settlement payment toward the Shareholder Lawsuit, as well

as for other payments unrelated to the purported oncology licensing transaction. Because an

initial payment for the licensing transaction was made on September 16, 2021, none of Investor

3's money could have gone to pay for the licensing deal because it was deposited on September

24, 2021, and no other payments were made towards the licensing transaction before these

investors' money was disbursed.

       4.    **Each of These Representations Were Made With Scienter and Were Material.**

85.    Each of the above representations regarding the specific use of these investor

funds were false when made, and Defendants knew or were reckless in not knowing, and should

have known, that their statements were false and misleading because the Defendants intended to
and did use the money for purposes other than what they had disclosed to investors and knew
that they had not disclosed to investors the true purposes for which they would use these investor
funds.

86.    The above misrepresentations regarding specific use of funds were material
because a reasonable investor would consider whether Defendants would use their money as
represented when deciding whether to invest.

**E.    Defendants Made Materially False and Misleading Statements and
Omissions About the Shareholder Lawsuit.**

87.    During the Relevant Period, Defendants represented to investors that Reven,
Reven Pharmaceuticals, Lange, and Volk were not the subject of any litigation. These statements
include:

a. Reven's 2018 PPM unequivocal statement that, "The Company is not currently
the subject of any litigation."

b. A representation in a February 13, 2020 email from Lange, copying Volk, to
Investor 1, that, "we have no lawsuits from shareholders."

c. The 2020 PPM representation that: "As of the date of this Memorandum *we are
not aware* of potential dispute or *pending litigation* and are not currently
involved in a litigation proceeding or governmental actions the outcome of
which in management's opinion would be material to our financial condition or
results of operations." (Emphasis added).

88.     A reasonable investor would have understood from the representations referenced above that neither Reven/Reven Pharmaceuticals nor its officers and directors were involved in any litigation.

89.     These statements were false and misleading because a securities fraud lawsuit was filed by an investor in 2016 against Reven Pharmaceuticals and Lange and was pending in 2018 and throughout the Relevant Period.  The Shareholder Lawsuit alleged that Reven Pharmaceuticals and Lange made false statements and omitted material facts regarding the company and RJX in connection with inducing an investor with diminished capacity to invest millions of dollars. Among other things, the investor alleged that the Defendants failed to disclose that "Reven Pharmaceuticals, in its ten plus year existence, had no revenue or earnings from operations, no market for its shares, and sustained itself by raising monies through investor funds."

90.     By November 2019, the plaintiff in the Shareholder Lawsuit had filed a third amended complaint to add Reven, LLC, Reven Holdings, Inc., and Michael Volk as parties. Reven Pharmaceuticals, Inc. and Lange were still parties to that case.

91.     In September 2021, as discussed above in paragraphs 79 and 84, Reven used $2.75 million of investor funds obtained during the Relevant Period to settle the undisclosed Shareholder Lawsuit.

92.     Each of the above representations regarding Reven, Reven Pharmaceuticals, Lange, and Volk's involvement in litigation were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and

misleading because the Defendants had knowledge of the Shareholder Litigation at the time they

made the statements because Volk and Lange were named defendants.

93.     The above misrepresentations regarding Reven, Reven Pharmaceuticals, and its

directors and officers involvement in litigation were material to investors and potential investors

because a reasonable investor would want to know if the company or its officers or directors

were the subject of litigation, and certainly any litigation involving claims of securities fraud,

when deciding whether to invest.

## IV.     DEFENDANTS ENGAGED IN ADDITIONAL FRAUDULENT AND DECEPTIVE CONDUCT BY SETTING UP AND MAKING PAYMENTS TO A PASS-THROUGH SHELL COMPANY TO PAY THE REVEN PRINCIPALS.

94.     As detailed above, Defendants defrauded investors in multiple ways, including by

misappropriating investor funds and making false and misleading statements. The Reven

Principals also engaged in deception when they created a pass-through or shell company, Relief

Defendant Health Analytics, to facilitate transferring investor money to the Reven Principals.

95.     Volk is an owner of Health Analytics and he and Lange had signatory authority

over its bank account.

96.     Health Analytics provided no goods or services to Reven or Reven

Pharmaceuticals.

97.     During the Relevant period, the Defendants caused Reven Pharmaceuticals to

funnel over $1.8 million of investor funds to Health Analytics, which was then disbursed to the

Reven Principals or for their benefit.

**V.     REVEN STOCK IS A SECURITY; DEFENDANTS' CONDUCT SATISFIES THE IN CONNECTION WITH" AND "IN THE OFFER OR SALE" REQUIREMENTS; THEY USED THE INSTRUMENTALITIES OF INTERSTATE COMMERCE.**

98.     The Reven common stock offered and sold to investors by the Defendants is a "security" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, which define a "security" to include, among other things, "any . . . stock."

99.     The misstatements and omissions alleged herein were made by Defendants and disseminated by Defendants to induce investors to buy the securities offered through the Reven offerings of securities, and investors did, in fact, purchase Reven securities based on these false and misleading statements.

100.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, including soliciting investors located in Colorado and other states by telephone and email, providing documents containing false and misleading statements to investors via email, and obtaining funds from those investors through interstate commerce.

101.     For example, a number of the misstatements and omissions alleged herein were made in the written Offering Documents disseminated to investors by Defendants, such as the PPMs, Investor Decks, and information in emails.

## VI.  RELIEF DEFENDANTS RECEIVED PROCEEDS OR OWN OR MAINTAIN ASSETS FROM DEFENDANTS' FRAUD TO WHICH THEY HAVE NO LEGITIMATE CLAIM.

102.    As alleged above, Relief Defendants Health Analytics received proceeds from Defendants' fraud for which it provided no reciprocal goods or services, and to which it has no legitimate claim. As a result, those funds should be returned to defrauded investors.

103.    As alleged above, Relief Defendants Reven LLC, Reven IP, Reven Oncology are the owners or potential owners of valuable assets in the form of intellectual property, which has been obtained, maintained, expanded, or exploited by the proceeds of the fraud. Prior to and continuing through the Relevant Period the intellectual property was transferred to these Relief Defendants without consideration.

### CLAIMS FOR RELIEF

### First Claim for Relief
### Section 17(a) of the Securities Act
(All Defendants)

104.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

105.    Defendants, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon the
purchaser.

106.    By engaging in the conduct described above, Defendants violated, and unless
restrained and enjoined will continue to violate, Section 17(a) of the Securities Act. 15 U.S.C. §§
77q(a).

**Second Claim for Relief**
**Section 10(b) and Rule 10b-5 of the Exchange Act**
(All Defendants)

107.    The SEC realleges and incorporates by reference in this claim for relief the
allegations set forth above.

108.    Defendants, directly or indirectly, in connection with the purchase or sale of a
security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of
the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices,
schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state
a material fact necessary in order to make the statements made, in the light of the circumstances
under which they were made, not misleading; and (c) engaged in acts, practices, or courses of
business which operated or would operate as a fraud or deceit upon other persons.

109.    By engaging in the conduct described above, Defendants violated, and unless
restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §
78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### Third Claim for Relief
### Control Person Liability Under Section 20(a) of the Exchange Act for Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Alternatively, Against Denomme, Lange, and Volk)

110.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

111.    As alleged above, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

112.    During the Relevant Period, Denomme, Lange, and Volk, as co-founders, most-senior executive officers, sole acting directors, and collectively, majority owners of Reven and Reven Pharmaceuticals, exercised control over the management, general operations, and polices of Reven and Reven Pharmaceuticals, as well as the specific activities upon which their violations are based.

113.    By reason of the foregoing, Denomme, Lange, and Volk are liable as a control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Reven and Reven Pharmaceuticals' violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### Fourth Claim for Relief
### Disgorgement from Relief Defendants – Pursuant to Section 6501 of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 and Equitable Principles
(Relief Defendants Reven LLC, Reven IP, Reven Oncology, and Health Analytics)

114.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

115.    Each Relief Defendant obtained money, property, and assets that are the proceeds, or are traceable to the proceeds, of the fraud and violations of the securities laws by Defendants.

116.    Each Relief Defendant has no legitimate claim to these illicit proceeds or assets,

having obtained the funds under circumstances in which it is not just, equitable, or conscionable

for it to retain the funds or assets, and therefore each of them has been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC seeks the following relief:

1.    Find that the Defendants committed the violations alleged in this Complaint;

2.    Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of

Civil Procedure, temporarily, preliminary and, permanently restraining and enjoining Defendants

and their agents, servants, employees, attorneys, and accountants, and those persons in active

concert or participation with them, who receive actual notice of the Final Judgment by personal

service or otherwise, and each of them, from engaging in transactions, acts, practices, and

courses of business described herein, and from engaging in conduct of similar purport and object

in violation of Section 17(a) of Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder;

3.    Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, permanently restraining and enjoining the Reven Principals from directly or

indirectly, including, but not limited to, through any entity owned or controlled by them,

participating in the issuance, purchase, offer, or sale of any security, provided, however, with the

exception of any securities issued by Reven or Reven Pharmaceuticals, that such injunction shall

not prevent them from purchasing or selling securities for their own personal account;

4.    Order Defendants to disgorge ill-gotten gains received during the period of

violative conduct and pay prejudgment interest on such ill-gotten gains;

33

5.      Order Defendants to pay civil money penalties pursuant to Section 20(d) of the

Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §

78u(d)(3);

6.      Order that each of the Reven Principals be permanently prohibited from acting as

an officer or director of any public company; and

7.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated:  December 8, 2022               Respectfully submitted,

By:   *s/ Kenneth E. Stalzer*
       Kenneth E. Stalzer
       Sharan E. Lieberman
       U.S. Securities and Exchange Commission
       1961 Stout Street, Suite 1700
       Denver, CO 80294-1961
       Telephone: 303-844-1055 (Stalzer)
                303-844-1036 (Lieberman)
                303-844-1000 (Main)
       Email: stalzerk@sec.gov
            liebermans@sec.gov
       *Attorneys for Plaintiff*
       *U.S. Securities and Exchange Commission*